UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DIANE M SCHLICKER,

                Plaintiff,                        Civil Action No. 10-cv-13697

      v.                                 District Judge Thomas L. Ludington
                                              Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [13, 19]**

Plaintiff Diane Schlicker brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act. Both parties filed summary judgment motions (Dkts. 13, 19), which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) (Dkts. 3, 14).

**I. RECOMMENDATION**

For the reasons set forth below, this Court finds that the ALJ's narrative fails to adequately explain how Plaintiff's severe impairment of dizziness was accounted for in determining Plaintiff's residual functional capacity. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED.

## II. REPORT

### A. Procedural History

On October 25, 2007, Plaintiff filed an application for DIB asserting that she became unable to work on August 1, 2000. (Tr. 11, 91.) The Commissioner initially denied Plaintiff's disability application on March 20, 2008. (Tr. 11, 66-70.) Plaintiff then filed a request for a hearing, and on January 4, 2010, she appeared without counsel before Administrative Law Judge ("ALJ") Elliott Bunce, who considered the case *de novo*. (Tr. 37-64.) In a January 8, 2010 decision, the ALJ found that Plaintiff was not disabled. (Tr. 11-17.) The ALJ's decision became the final decision of the Commissioner on August 2, 2010 when the Appeals Council denied Plaintiff's request for review. (Tr. 1.) Plaintiff filed this suit for a remand to the Commissioner on September 16, 2010. (Dkt. 1; Dkt. 13, Pl.'s Mot. Summ. J. (seeking remand only).)

### B. Background

Plaintiff, born June 6, 1953, was 47 years old on her alleged disability onset date and 52 years old as of her date last insured (the date that Plaintiff must have been disabled for purposes of receiving DIB). Prior to the asserted August 2000 disability onset date, Plaintiff worked as a cleaning maid, a food preparer in a restaurant, and a janitor. (Tr. 124.) Plaintiff graduated highschool through special education and can read at the third-grade level. (Tr. 45-46, 53.) Plaintiff is married. (Tr. 52.)

Plaintiff has a history of dizziness and depression dating back to her alleged onset date but was not diagnosed with multiple sclerosis (a disease that has varied symptoms including dizziness and depression) until October 2007. (Tr. 54, 227.) This is significant because Plaintiff's date last insured was September 30, 2005. (Tr. 13, 66.)

2

### 1.  The Hearing Before the ALJ

Plaintiff and a Vocational Expert testified at the January 4, 2010 video hearing before ALJ Bunce.  Also present at the hearing were Plaintiff's two sisters.  (Tr. 39.)  Neither sister testified, but one, Brenda Kemp, appeared as Plaintiff's non-attorney representative.  (Tr. 42.)

### (a)  Plaintiff's Testimony

The ALJ's questioning focused on Plaintiff's condition as of September 2005 (corresponding to her date last insured).  Plaintiff explained that her health was "worse now" than back then.  For example, she said she used a motorized scooter while shopping because of her weak legs.  (Tr. 55.)  But Plaintiff agreed with the ALJ that she did not have a problem walking back in 2005 and said that her legs were "good, okay" back then.  (Tr. 56-57.)  Plaintiff also stated that she had no problems standing or sitting in 2005.  (Tr. 58.)  Similarly, Plaintiff attested that, at the time of the hearing, she had problems breathing, but in 2005 her breathing was "okay."  (Tr. 56.)  Plaintiff also testified that, in 2005, she was capable of doing "just about" all varieties of household chores, including, "dusting, vacuuming, [and] laundry."  (Tr. 54.)  Plaintiff did testify that she suffered from depression well before her date last insured, but could not recall how severe her depression was at that time.  (Tr. 54-56.)

### (b) The Vocational Expert's Testimony

Vocational Expert ("VE") Pauline McElchin also testified at the hearing before the ALJ.  (Tr. 59-63.)  The ALJ asked VE McElchin to consider the following hypothetical individual:

> an individual of the Claimant's age as of September 30, 2005, education and work background, who's able to perform work at the light exertional level, that consists of no more than simple, routine, repetitive tasks, with one or two step instructions and that does not require reading above the third grade level.

(Tr. 60.)  The VE testified that such an individual could perform jobs as a housekeeper, janitor, kitchen helper, and packager, all with over 100,000 jobs available in the national economy.  (Tr. 61-62.)

### 2. Medical Evidence

As the Commissioner notes, "evidence relating to a time outside the insured period is only minimally probative" to the disability determination but nonetheless "may be considered to the extent it illuminates a claimant's health before the expiration of his insured status." *Nagle v. Comm'r of Soc. Sec.*, 191 F.3d 452 (table), 1999 WL 777355 (6th Cir. 1999) (citing *Higgs v. Bowen*, 880 F.2d 860 (6th Cir. 1988)); *see also Swartz v. Barnhart*, 188 F. App'x 361, 369-70 (6th Cir. 2006). Accordingly, the Court summarizes the medical evidence of record in two parts: medical evidence in existence prior to Plaintiff's date last insured, September 30, 2005, and medical records for treatment after that date.

### (a) Medical Evidence Prior to the Date Last Insured

In December 2001, Plaintiff saw Dr. Jorge Plasencia, her primary-care physician, for the first of many visits.  (Tr. 308.)  Plaintiff complained of "dizziness, fatigue, 'cold spells,' and shakes which usually affect her during the noon hour."  (Tr. 308.)  Plaintiff had been eating only once a day, however, and had also recently discontinued depression medication.  (Tr. 308.)  Dr. Plasencia's impression was "dizziness, possibly secondary to chronic hypoglycemia," and depression.  (Tr. 308.) About two weeks later, Plaintiff reported "dramatic improvement" in her symptoms as a result of eating twice a day.  (Tr. 307.)  Dr. Plasencia diagnosed Plaintiff with "[r]ecurrent hypoglycemic episodes, improved with dietary modification."  (Tr. 307.)

In January 2002, Plaintiff returned to Dr. Plasencia indicating after-meal fullness and an

4

inability to keep herself from eating.  (Tr. 306.)  Dr. Plasencia opined that it was "clear" that Plaintiff suffered from obsessive-compulsive disorder. (Tr. 306.) Plaintiff's husband informed Dr. Plasencia that Plaintiff had recently stopped taking her medication, Zyprexa, prescribed for her depression or anxiety.  (Tr. 306.)  Dr. Plasencia diagnosed Plaintiff with obsessive-compulsive disorder and Zyprexa withdrawal. (Tr. 306.) He provided Plaintiff with Zyprexa, and recommended psychiatric treatment.  (Tr. 306.)  Later, Plaintiff's husband reported to Dr. Plasencia that he had "noticed a dramatic improvement since [Plaintiff] has been taking her psychotropic medications again."  (Tr. 305.)

In February 2002, Plaintiff reported to Dr. Plasencia that she had occasionally felt dizzy over the prior few weeks.  (Tr. 305.)  As before, Dr. Plasencia diagnosed Plaintiff with hypoglycemia. (Tr. 305.)  But the next month, when Plaintiff again complained of dizziness, especially when abruptly changing her head position, Dr. Plasencia changed his diagnoses to "labrynthitis [versus] benign positional vertigo."  (Tr. 304.)[1]

In April 2002, Plaintiff stated to Dr. Plasencia that she had two "near-signal episodes which resulted after she rapidly assumed the upright position."  (Tr. 303.)  Dr. Plasencia noted that the episodes may be a consequence of taking Zyprexa and diagnosed Plaintiff with syncope (loss of consciousness).  (Tr. 303.)  He also referred Plaintiff for a tilt-table test.  (Tr. 303.)[2]

_____

[1]The vestibular labyrinth is "the portion of the membranous labyrinth [in the ear] concerned with the sense of equilibration (vs. the cochlear labyrinth, which is concerned with the sense of hearing) . . . ."  *Stedman's Medical Dictionary*, Labyrinth (27th ed. 2000).  And benign position vertigo consists of "brief attacks of paroxysmal vertigo and nystagmus that occur solely with certain head movements or positions, e.g., with neck extension; due to labyrinthine dysfunction." *Stedman's Medical Dictionary*, Vertigo (27th ed. 2000).

[2]"A tilt table test is used to evaluate the cause of unexplained fainting (syncope).  During a tilt table test, [the patient] lie[s] on a table that moves from a horizontal to a vertical position. [The

In July 2002, Plaintiff returned to Dr. Plasencia with complaints of "persistent dizziness." (Tr. 302.) She reported that the symptoms typically occurred with sudden movements such as sitting down or vacuuming. (Tr. 302.) Plaintiff also mentioned not feeling full after meals. (Tr. 302.) Dr. Plasencia noted that Plaintiff's tilt-table test was negative and believed that these symptoms were side-effects of taking Zyprexa. (Tr. 302; *see also* Tr. 268.)

In October 2002, Dr. Plasencia noted that Plaintiff expressed continuing "concern[s] about occasional episodes of lightheadedness and an inability to feel satiated." (Tr. 301.)

Although Plaintiff saw Dr. Plasencia in January 2003, she next reported dizziness at her July 2003 visit. (Tr. 299.) Plaintiff told Dr. Plasencia that she continued to experience lightheadedness when she arose from a chair or turned abruptly. (Tr. 299.) She believed that the episodes were not from her medication because they had occurred before she starting taking Zyprexa. (Tr. 299.) Dr. Plasencia diagnosed Plaintiff with vertigo and referred Plaintiff to an ear, nose, and throat ("ENT") specialist. (Tr. 299.)

In July 2003, the ENT specialist, whose name is not discernable from the record, noted that Plaintiff's earlier tilt-table test had been negative and ordered another test. (Tr. 269.) The next month, the ENT specialist noted the results of Plaintiff's second test were also negative and suggested that Plaintiff change her medication and consider a neurological evaluation. (Tr. 275.)

Plaintiff returned to Dr. Plasencia in December 2003 with complaints of "dizziness on rising." (Tr. 298.) Dr. Plasencia noted, however, that her "episodes are now quite rare." (Tr. 298.) Dr. Plasencia also remarked that her depression and obsessive-compulsive disorder were "a great

---

patient's heart rate and blood pressure are monitored throughout the tilt table test." Mayo Clinic Staff, *Tilt Table Test Definition* (Feb. 3, 2010) *available at* http://www.mayoclinic.com/health/tilt-table-test/MY01091.

deal better." (Tr. 298.) He prescribed Dramamine for Plaintiff's dizziness. (Tr. 298.)

In December 2004, Plaintiff stated, apparently in regards to her mood and mental condition, that she was "[v]ery happy with her response to Zyprexa." (Tr. 296.) Dr. Plasencia did not note any complaints of dizziness. (Tr. 296.) It appears, however, that Plaintiff reported "some" palpitations. (Tr. 296.)

Six months later, in June 2005, Plaintiff denied "headaches, chest pain, [and] palpitations." (Tr. 295.) Later that month, upon reviewing laboratory results, Dr. Plasencia diagnosed Plaintiff with hypercholesterolemia (elevated cholesterol levels in the blood). (Tr. 294.)

Plaintiff returned to Dr. Plasencia in September 2005. (Tr. 293.) Dr. Plasencia noted, "the patient indicates that she has periodically experienced dizziness. This has been exhaustively investigated and the consensus is that her symptoms are a consequence . . . of . . . [taking] Zyprexa." (Tr. 293.) He advised Plaintiff to continue with Zyprexa, however, because it helped keep her mood "stable" (Tr. 293.) "Besides," Dr. Plasencia commented, "the dizziness is not disabling." (Tr. 293.) Dr. Plasencia also prescribed Lipitor for Plaintiff's hypercholesterolemia. (Tr. 293.)

In March 2008, Dr. Robert Nelson thoroughly reviewed Plaintiff's medical records and assessed Plaintiff's residual functional capacity ("RFC") on behalf of the State Disability Determination Services ("DDS"). (Tr. 394-403.) (Although his assessment was made after Plaintiff's date last insured, it is presented here because the assessment was not for Plaintiff's then-current state but for her functional capacity as of her date last insured. (*See* Tr. 395.)) Dr. Nelson found that while Plaintiff could perform light work, she could "never" climb ladders, ropes, or scaffolds; could only "occasionally" crawl; and had to "avoid even moderate exposure" to hazards such as machinery and heights. (Tr. 397, 399.)

7

*(b) Medical Evidence After the Date Last Insured*

Plaintiff continued to see Dr. Plasencia on a regular basis through 2007. On October 1, 2007, two years after her date last insured, Plaintiff presented to Dr. Plasencia with complaints of chest pain and numbness in her face and arm. (Tr. 284.) She also reported passing out twice the week before. (Tr. 284.) Dr. Plasencia noted possible "cerebrovascular accident" (stroke) and referred Plaintiff to the emergency room. (Tr. 284.) Over the next few days a number of tests were performed on Plaintiff, including, an echocardiogram (Tr. 234), an EKG (Tr. 233), and multiple imaging studies of Plaintiff's brain, head, chest, and cervical spine (Tr. 226, 229-32). An October 3, 2007, MRI of Plaintiff's brain revealed "minimal small areas of increased intensity" which were most likely "secondary to demyelinating process, probably representing secondary to multiple sclerosis." (Tr. 227.)[3]   Plaintiff was started on steroids for probable multiple sclerosis and discharged. (Tr. 208-09.)

In November 2007, Plaintiff began treatment with Dr. Barbara Jahnke, a neurologist, and continued treatment with her through at least October 2009. (*See* Tr. 388, 495.) On November 2, 2007, Dr. Jahnke performed a lumbar puncture and diagnosed Plaintiff with "demyelination, nonspecific." (Tr. 388.)

Dr. Jahnke also referred Plaintiff to Dr. Scott Vandenbelt in November 2007. (Tr. 467.)

---

[3]"Multiple sclerosis (MS) is a potentially debilitating disease in which [the] body's immune system eats away at the protective sheath that covers [its] nerves. This interferes with the communication between [the] brain and the rest of [the] body. Ultimately, this may result in deterioration of the nerves themselves, a process that's not reversible." (Pl.'s Mot. Summ. J., Ex. A (multiple sclerosis definition from the Mayo Clinic).) Multiple sclerosis symptoms may include: "numbness or weakness in one or more limbs, which typically occurs on one side of [the] body at a time or the bottom half of [the] body," loss of vision or blurring of vision, lack of coordination or unsteady gait, fatigue, and dizziness. (*Id.*)

Plaintiff reported to Dr. Vandenbelt that she had been experiencing blurry vision for several weeks. (Tr. 467).  Dr. Vandenbelt performed an optical coherence tomography due to "questionable multiple sclerosis."  (Tr. 467.)  The results appeared to show eye nerve fiber thinning but Dr. Vandenbelt explained that the apparent thinning was probably artifactual.  (Tr. 467.)

During 2008 and 2009, Dr. Jahnke and Shawna Federico, a nurse practitioner in Dr. Jahnke's office, treated Plaintiff for symptoms related to her multiple sclerosis.  In September 2008, Plaintiff reported to Ms. Federico that she still had paresthesia in her face, her vision seemed worse, and that her legs were aching all the time.  (Tr. 517.)  In April 2009, Plaintiff reported to Ms. Federico that she fell backwards and broke her bedroom door when trying to walk to her dresser.  (Tr. 501.) Plaintiff told Ms. Federico that she always fell when she attempted to walk without a cane or walker. (Tr. 501.)

Over this period, 2008 through 2009, Plaintiff also saw Dr. Plasencia several times.  On December 29, 2009, Dr. Plasencia wrote the following letter "to whom it may concern":

> Ms. Diane Schlicker has been my patient since 2001.  Over the last several years she began experiencing weakness in the extremities, imbalance, dizziness and difficulty with ambulation.  A thorough evaluation by her neurologist confirmed the suspected diagnosis of multiple sclerosis.  This condition has only exacerbated her underlying emotional status.  Please note that limitations imposed by the demyelization disorder and her chronic depression make it impossible for the patient to work. She should be considered totally disabled and is unable to perform any type of work.  Please feel free to contact me should you have any questions or concerns about Diane.

(Tr. 571.)[4]

---

[4]From late 2008 through early 2009, Plaintiff also had injections to alleviate pain performed by Dr. Diane Czuk-Smith.  Dr. Czuk-Smith diagnosed Plaintiff with low back pain secondary to degenerative disc disease and facet syndrome and chronic neck pain and intermittent headaches

**C.  Framework for Disability Determinations**

Under the Social Security Act (the "Act") Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

---

secondary to problems in Plaintiff's cervical spine.  (Tr. 474-490.)  She noted, however, that some of Plaintiffs pain may be related to her multiple sclerosis.  (Tr. 490.)

10

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.  The Administrative Law Judge's Findings

At step one, ALJ Bunce found that Plaintiff had not engaged in substantial gainful activity between her alleged onset date of August 1, 2000 and her date last insured of September 30, 2005. (Tr. 13.)  At step two, the ALJ found that Plaintiff had the following severe impairment: dizziness. (Tr. 13.)  Next, he concluded this impairment did not meet or medically equal a listed impairment. (Tr. 14.)  Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b).  (Tr. 14.)  That regulation provides:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b); *see also* S.S.R. 83-10, 1983 WL 31251, at *5 ("Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour

11

workday.").  At step four, the ALJ found that Plaintiff could perform her past relevant work as a janitor or housekeeper.  (Tr. 15.)  Proceeding in the alternative to step five, the ALJ relied on VE testimony in response to his hypothetical, and found that work existed in significant numbers that Plaintiff could perform: housekeeper, janitor, kitchen helper, café attendant, and packager.  (Tr. 16.)

### E.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole.  *Bass*, 499 F.3d

at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

**F.  Analysis**

1.   *The ALJ's Narrative Fails to Adequately Explain How Plaintiff's Severe Impairment Was Incorporated into the Residual Functional Capacity Assessment*

Plaintiff asserts that the ALJ's residual functional capacity ("RFC") assessment of "light work" does not accurately portray what Plaintiff can and cannot do. (Dkt. 13, Pl.'s Mot. Summ. J. at 3-4.) Plaintiff similarly argues that the hypothetical the ALJ provided to the VE at the hearing, which includes additional non-exertional limitations, is also an inaccurate reflection of Plaintiff's limitations during the disability period. (*Id.* at 3); *see also Infantado v. Astrue*, 263 F. App'x 469, 476 (6th Cir. 2008) (While "a hypothetical question need not incorporate a listing of the claimant's medical conditions, the vocational expert's testimony, to be reliable, must take into account the claimant's functional limitations, i.e., what he or she 'can and cannot do.'" (citing *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 632-33 (6th Cir. 2004))). In particular, Plaintiff points out that the ALJ's RFC assessment "does not incorporate any functional limitations associated with dizziness." (*Id.*

13

at 3.)  And, Plaintiff continues, "[a] claimant who suffers from dizziness, for example, may be unable to work at unprotected heights and only very occasionally climb ramps or stairs. . . .  Such a claimant may also be precluded from working in a dangerous environment."  (*Id.* at 4.)

The Commissioner disagrees and contends that the ALJ's RFC assessment and hypothetical "adequately accounted for Plaintiff's limitations."  (Dkt. 19, Def.'s Mot. Summ. J. at 12-14.)  The Commissioner explains that the ALJ's step-two finding that Plaintiff had the severe impairment of dizziness is not inconsistent with the ALJ's RFC assessment: "the ALJ's RFC finding represents a conclusion, based on Plaintiff's testimony, that she had some degree of limitation prior to her date last insured, but not to the extent that it would impose specific and extensive restrictions."  (*Id.* at 12.)

The problem here, however, is that the ALJ's narrative fails to provide any explanation of why it was proper to find a severe impairment of dizziness and yet exclude common, expected, functional limitations associated with that impairment.  This Court "'may not uphold an ALJ's decision, even if there is enough evidence in the record to support it, if the decision fails to provide an accurate and logical bridge between the evidence and the result.'"  *Pollaccia v. Comm'r of Soc. Sec.*, No. 09-cv-14438, 2011 WL 281044, at *6 (E.D. Mich. Jan. 6, 2011) *report adopted by* 2011 WL 281037 (E.D. Mich. Jan. 25, 2011) (quoting *Ramos v. Astrue*, 674 F. Supp. 2d 1076, 1080 (E.D. Wisc. 2009)); *see also Grandchamp v. Comm'r of Soc. Sec.*, No. 09-cv-10282, 2010 WL 1064144, at *10 (E.D. Mich. Jan. 25, 2010) *report adopted in relevant part by* 2010 WL 1064138 (E.D. Mich. Mar. 22, 2010) ("'While the ALJ is not required to address every piece of evidence, he must articulate some legitimate reason for his decision.  Most importantly he must build an accurate and logical bridge from the evidence to his conclusion.'" (quoting *Clifford v. Apfel*, 227 F.3d 863, 872

(7th Cir. 2000)); *cf. Lowery v. Comm'r of Soc. Sec.*, 55 F. App'x 333, 339 (6th Cir. 2003) (noting

that an "'ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but

must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to

trace the path of his reasoning.'" (quoting *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

Moreover, in this case Plaintiff challenges the accuracy of the ALJ's RFC assessment and

thus a specific explanatory requirement is implicated:

> NARRATIVE DISCUSSION REQUIREMENTS
>
> The RFC assessment must include a narrative discussion describing
> how the evidence supports each conclusion, citing specific medical
> facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily
> activities, observations).  In assessing RFC, the adjudicator must
> discuss the individual's ability to perform sustained work activities in
> an ordinary work setting on a regular and continuing basis (i.e., 8
> hours a day, for 5 days a week, or an equivalent work schedule), and
> describe the maximum amount of each work-related activity the
> individual can perform based on the evidence available in the case
> record.   The adjudicator must also explain how any material
> inconsistencies or ambiguities in the evidence in the case record were
> considered and resolved.

S.S.R. 96-8p, 1996 WL 374184, at *6-7 (internal footnote omitted).  SSRs "are binding on all

components of the Social Security Administration" and "represent precedent final opinions and

orders and statements of policy and interpretations" adopted by the agency.   20 C.F.R.

§ 402.35(b)(1); *see also Evans v. Comm'r of Soc. Sec.*, 320 F. App'x 593, 596, 2009 WL 784273,

at *2 (9th Cir. Mar. 25, 2009) ("'Federal statutes, administrative regulations and Social Security

Rulings together form a comprehensive scheme of legal standards that ALJs must follow in

determining whether a claimant is entitled to disability benefits.'" (quoting *Terry v. Sullivan*, 903

F.2d 1273, 1275 (9th Cir. 1990))).

The ALJ only provided limited discussion of Plaintiff's dizziness.  At step two, he noted that

"the etiology of [Plaintiff's] dizziness and syncope was not established" prior to the date last insured but that he would nonetheless construe the evidence in Plaintiff's favor and treat dizziness as a severe impairment. (Tr. 13.) At step three, in the context of analyzing Plaintiff's alleged depression, the ALJ provided his only functional limitation finding regarding Plaintiff's dizziness: "The residual functional capacity adopted here (finding 5) specifies simple, routine tasks to accommodate any stress that may have contributed to the claimant's dizziness.  This provision should also accommodate any possible effect from the claimant's depression." (Tr. 14.)[5]  Between steps three and four, in crafting Plaintiff's RFC, the totality of the ALJ's case-specific reasoning was:

> The claimant testified to conditions other than those discussed above (finding 3), including multiple sclerosis, which she said was first diagnosed in October 2007, and limited vision, which [she] said first occurred in 2007, although she wore prescription lenses as of the date last insured.  There is no evidence that these were present as of the date last insured.  The claimant testified that as of the date last insured her walking was limited, because her legs were weak.  She did not feel able to estimate her ability to lift and carry as of that date but said her ability to walk, stand, and sit were satisfactory.  That testimony contradicted somewhat her earlier statement that her walking was limited, but I do not find evidence during the relevant period that she could not do the standing and walking required by light exertion.  Therefore, I conclude[] that the RFC accommodates the shortcomings established on this record.

(Tr. 15.)

Given this analysis in the ALJ's narrative, the Court does not follow how the ALJ found, on the one hand, that Plaintiff's dizziness was of sufficient severity to "significantly limit[]" her "ability to perform basic work activities" (Tr. 12), and, on the other hand, that Plaintiff's RFC did not require

---

[5]The ALJ's RFC in fact includes no such limitation but the Court recognizes that the ALJ was relying on the hypothetical he provided to the VE which included limitations of "no more than simple, routine, repetitious tasks, with one or two step instructions and that does not require reading above the third grade level."  (Tr. 60.)

any functional limitations relating to climbing, balancing, repeated bending, working at heights, or working with hazards (to name a few). *See O'Neal v. Comm'r of Soc. Sec.*, No. 1:10-cv-531, 2011 WL 4383724, at *15 (S.D. Ohio Aug. 24, 2011) ("[I]t is disingenuous for the ALJ to determine fibromyalgia is a severe impairment which significantly limits plaintiff's ability to perform basi[c] work activities and then assign no restrictions whatsoever based on the impairment. In determining plaintiff's RFC, it was incumbent upon the ALJ to assess the medical evidence to determine not whether plaintiff has fibromyalgia, but what limitations she suffers as a result and to include those functional restrictions in the RFC assessment."). The ALJ's step-two analysis merely discusses why Plaintiff's dizziness was arguably not a severe impairment; but once he acknowledged that it was a medically determinable impairment with the requisite severity, he had at least a limited obligation to state how he accounted for the impairment in his RFC (or why it did not).[6] Finally, the ALJ's analysis between steps three and four does not provide an explanation of why functional limitations attributable to dizziness were not incorporated into the RFC determination – in fact, the above-quoted language makes no mention of Plaintiff's lone severe impairment.

The narrative's inadequate explanation for why functional effects of Plaintiff's dizziness were not incorporated in Plaintiff's RFC is particularly troubling in light of the record evidence. In particular, Dr. Robert Nelson, a State DDS physician, completed an RFC assessment pertaining to Plaintiff's disability prior to the date last insured and included a number of limitations attributable

---

[6]In addition, the step-two statement is not supported by substantial evidence: nothing in the record suggests that Plaintiff's dizziness was caused by situational stress; the pre-date-last-insured evidence provides that Dr. Plasencia first believed Plaintiff's dizziness was caused by her diet and later by her situational-independent (i.e., periodic) medication.

to Plaintiff's dizziness impairment.  (Tr. 394-403.)[7]  He found that while Plaintiff could perform light work, she could "never" climb ladders, ropes, or scaffolds; could only "occasionally" crawl; and had to "avoid even moderate exposure" to hazards such as machinery and heights.  (Tr. 397, 399.)  As to the hazards limitation, Dr. Nelson remarked, "[a]void hazardous work due to [history] of lightheadedness."  (Tr. 399.)  Further, Dr. Nelson's evaluation was not unsupported; it was based on, among other things, a thorough review of Dr. Plasencia's records.  (Tr. 402.)  The ALJ's narrative does not discuss Dr. Nelson's opinion at all, and the Court finds this problematic given that it is the only functional assessment of Plaintiff's physical impairments during the disability period.  *See Hurst v. Secretary of Health and Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985) ("It is more than merely 'helpful' for the ALJ to articulate reasons . . . for crediting or rejecting particular sources of evidence.  It is absolutely essential for meaningful appellate review." (quoting *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984))).

In short, substantial evidence may support the ALJ's conclusion that Plaintiff's dizziness affected her ability to perform basic work functions but did not result in any physical functional limitations.  But the ALJ should have explained to Plaintiff and the Court why he believed this was

---

[7]The Commissioner suggests, in a footnote, that the Court need not (or should not) consider Dr. Nelson's opinion because "Plaintiff does not argue that the ALJ erred in not adopting this opinion."  (Def.'s Mot. Summ. J. at 13 n.2).   The Court does not view Plaintiff's arguments so narrowly.  Plaintiff has argued that the ALJ erred in not accounting for the severe impairment of dizziness in formulating his hypothetical and RFC assessment.  The Court therefore has the obligation to review the record as a whole and determine whether substantial evidence supports the ALJ's reasons for this omission.  *See Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992) ("In determining whether the Secretary's factual findings are supported by substantial evidence, we must examine the evidence in the record taken as a whole, and must take into account whatever in the record fairly detracts from its weight." (internal citations and quotation marks omitted)).  And, where, as here, the Court believes that the ALJ has not provided adequate reasons, the DDS physician's opinion is probative as to whether the procedural lapse is harmless and, ultimately, whether remand is required.

so. He did not. And the Court cannot readily determine that the error was harmless in view of the record evidence. Remand is therefore warranted.

### 2. The ALJ Did Not Err In Implicitly Concluding that Plaintiff's Multiple Sclerosis Was Not a Severe Impairment as of Plaintiff's Date Last Insured

Plaintiff also argues that the ALJ erred by failing to find that Plaintiff's multiple sclerosis – diagnosed two years after her date last insured – was a severe impairment during the period of DIB coverage. (Pl.'s Mot. Summ. J. at 4-5.) Plaintiff explains that multiple sclerosis is difficult to diagnose. (Pl.'s Mot. Summ. J. at 4, Exs. A, B.)[8] It follows, according to Plaintiff, that the disease was likely "present but not definitively diagnosed during the relevant time period" and should have been considered by the ALJ. (*See* Pl.'s Mot. Summ. J. at 5.)

The Sixth Circuit has provided that the threshold for finding an impairment severe is low. It has been described as a "*de minimis* hurdle," *Rogers*, 486 F.3d at 243 n. 2 (internal quotation marks omitted), intended to "screen out totally groundless claims," *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985). "Thus, if an impairment has 'more than a minimal effect' on the claimant's ability to do basic work activities, the ALJ must treat it as 'severe.'" *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576-77 (6th Cir. 2009) (quoting S.S.R. 96-3p, 1996 WL 374181 at *1).

In this case, even assuming that Plaintiff was suffering from undiagnosed multiple sclerosis

---

[8]In particular, multiple sclerosis "[s]ymptoms vary widely, depending on the amount of damage and which nerves are affected" and "can be difficult to diagnose early in the course of the disease because symptoms often come and go – sometimes disappearing for months." (Pl.'s Mot. Summ. J., Ex. A (multiple sclerosis definition from the Mayo Clinic).) According to the National Multiple Sclerosis Society, in order to diagnose the disease, a physician must (1) "[f]ind evidence of damage in at least two separate areas of the central nervous system (CNS), which includes the brain, spinal cord and optic nerves," (2) "[f]ind evidence that the damage occurred at least one month apart," and (3) "rule out all other possible diagnoses." (Pl.'s Mot. Summ. J., Ex. B.)

prior to the date last insured, the only pre-date-last-insured manifestations of that disease were depression and dizziness.  And thus, to the extent that Plaintiff's multiple sclerosis caused "more than a minimal effect" on Plaintiff's ability to do basic work activities, *see Nejat*, 359 F. App'x at 576-77, it did so by causing Plaintiff to be depressed and dizzy.  In fact, Plaintiff concedes that "[i]t is of course the case that it is the symptoms and manifestations of the disease process and not the diagnosis that ultimately stand as the disabling component of any illness."  (Pl.'s Mot. Summ. J. at 5.)  And the Court finds that the ALJ reasonably found that Plaintiff's dizziness was a severe impairment and her depression was not.[9]

Moreover, even if Plaintiff might have had multiple sclerosis prior to the date last insured, substantial evidence supports the contrary conclusion, and, therefore, the ALJ's finding that the disease was not a severe impairment as of September 30, 2005.  Regarding symptoms of numbness in Plaintiff's face and arm, such symptoms first appear in medical records from October 2007.  (*See* Tr. 284.)  Similarly, as to Plaintiff's vision, it appears she first reported problems in November 2007.  (*See* Tr. 467.)  In fact, Plaintiff testified at the hearing that her vision problems did not arise until 2007 and that her vision had worsened since 2005.  (Tr. 56.)  As for Plaintiff's aching legs and need to walk with an assistive device, no such symptoms or limitations appear among Dr. Plasencia's records and Plaintiff testified at the hearing that her legs were "good, okay" in 2005; she also agreed that she did not have difficulty walking at that time.  (Tr. 57-58.)  Further, no physician opined that Plaintiff's multiple sclerosis was longstanding or dated it back prior to September 30, 2005.  The closest any physician came to making such an assertion was Dr. Plasencia in December 2009.  (Tr.

---

[9]The Court adds that at step three the ALJ assessed Plaintiff's dizziness against "the criteria of § 11.00, Neurological, Appendix 1."  (Tr. 14); *see also* 20 C.F.R. pt. 404, subpt. P, app. 1 § 11.00 (discussing several neurological listings including Listing 11.09 for multiple sclerosis).

571.)  But his statement in this regard was not precise; he merely provided that in the "last several years" Plaintiff began experiencing weakness in her extremities, dizziness, and difficulty ambulating.  (Tr. 571.)  In contrast, the State DDS physician, Dr. Nelson – after a review of Plaintiff's medical records through at least December 2007 – explicitly stated that "[claimant] did not have a [medical evidence of record] from [the alleged onset date] to [the date last insured] that reasonably suggests or supports the [diagnosis] of [multiple sclerosis]."  (Tr. 394.)[10]

In short, the Court concludes that to the extent Plaintiff's multiple sclerosis had manifested itself in the form of dizziness and depression prior to the date last insured, the ALJ considered the disease in his disability determination, and substantial evidence supports the ALJ's conclusion that other symptoms of Plaintiff's multiple sclerosis did not exist prior to the date last insured.[11]

### G.  Conclusion

For the foregoing reasons, this Court finds that the ALJ's narrative fails to adequately explain how Plaintiff's severe impairment of dizziness was accounted for in determining Plaintiff's residual functional capacity.  Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED.

---

[10]It is unclear to the Court whether Plaintiff's chest pains are somehow attributable to multiple sclerosis.  But to the extent that they were, Plaintiff had only reported "some" palpitations once during the insured period and at the follow-up appointment she denied chest pains and palpitations.  (Tr. 295-96.)

[11]In light of this Court's findings as to the ALJ's treatment of Plaintiff's dizziness in formulating his RFC, the Court does not intend to imply that the ALJ *properly* considered that purported symptom of multiple sclerosis in all aspects of his disability analysis.

21

## III.  FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97.  Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office.  *See* E.D. Mich. LR 5.1.  A copy of any objections is to be served upon this magistrate judge but this does not constitute filing.  *See* E.D. Mich. LR 72.1(d)(2).  Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response.  E.D. Mich. LR 72.1(d)(3), (4).

> s/Laurie J. Michelson
> LAURIE J. MICHELSON
> UNITED STATES MAGISTRATE JUDGE

Dated:  November 4, 2011

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on November 4, 2011.

> s/Jane Johnson
> Deputy Clerk